IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JAMES D. ALMON,

                Plaintiff,

v.                                 Case No. 07-4104-SAC

THE GOODYEAR TIRE AND
RUBBER COMPANY,

                Defendant.

MEMORANDUM AND ORDER

This case comes before the court on defendant's motion for summary judgment. The plaintiff is an African-American who claims that he was discriminated against on the basis of his race in the terms and conditions of his employment, and in his lay off from employment, in violation of 42 U.S.C. §1981. Plaintiff additionally claims that his lay off was in retaliation for his whistleblowing, in violation of Kansas public policy.

**Summary Judgment Standard**

On summary judgment, the initial burden is with the movant to point out the portions of the record which show that the movant is entitled to judgment as a matter of law. *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.1992), *cert. denied*, 506 U.S. 1013 (1992). If this burden is met, the non-movant must set forth specific facts which would be admissible as evidence from which a rational fact finder could find in the non-movant's favor. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir.1998). The non-movant must show more than some "metaphysical doubt" based on "evidence" and not "speculation, conjecture or surmise." *Matsushita Elec.*

*Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538

(1986); *Bones v. Honeywell Intern.*, 366 F.3d 869, 875 (10th Cir. 2004). The essential

inquiry is "whether the evidence presents a sufficient disagreement to require

submission to the jury or whether the evidence is so one-sided that one party must

prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52, 106 S.Ct.

2505, 91 L.Ed.2d 202 (1986).

**Facts**

The parties agree on the vast majority of the facts. Where disputed, the facts are

construed in the light most favorable to the plaintiff.

The plaintiff is an African-American who had been employed by the defendant for

over twenty years before his position was eliminated in September of 2005. The

decision to lay off the plaintiff was initiated by his supervisor, Johnny Dudley, who is

also African-American. The race of the other persons who participated in that decision

has not been disclosed.

In 1999-2000, the plaintiff worked under Mr. Dudley in defendant's DeKalb,

Illinois distribution facility for a little less than a year and did not believe the two of them

had any racial issues. In July of 2000, the plaintiff was transferred from DeKalb to

Topeka as a lead auditor for a quality system standard called the ISO system.[1] The ISO

system at Goodyear's facility is designed to enhance the accuracy of shipping

automotive related products to the customers. Plaintiff reported to the on-site Zone

---

[1]"ISO" stands for "the International Organization for Standardization [which] is a worldwide federation of national standards bodies that promulgates technical specifications and other criteria in various industries." *Novo Nordisk A/S v. Becton Dickinson and Co.*, 997 F.Supp. 470, 476 (S.D.N.Y.1998).

Manager. In May of 2001, the plaintiff became the Zone Process Auditor.

On or about November of 2003, Mr. Dudley was brought in to Topeka to replace plaintiff's supervisor as the Zone Manager. The Zone Manager was replaced because an of unprecedented $6,000,000 discrepancy between the physical tire inventory and the book tire inventory while he was in charge of the Topeka Distribution Center. The plaintiff was second in command during that time, but asserts he was responsible only for the financial books and not for the inventory. The plaintiff was reassigned to an Inventory Manager position around the same time that Mr. Dudley became the Zone Manager.

When Mr. Dudley arrived in Topeka, he made no immediate changes because he wanted to evaluate the Distribution Center's operations. In January of 2004, Mr. Dudley completed annual performance evaluations for salaried employees for the 2003 calendar year, per company policy. Because he had little experience at the Topeka Distribution Center, Mr. Dudley rated the plaintiff, as he did all employees, as satisfactory or "competes well." Plaintiff's development action plan, included as part of that performance evaluation, listed four specific goals and actions which the plaintiff agreed to take in 2004 to help improve his performance.

 Soon thereafter, Mr. Dudley perceived that plaintiff was resistant to his management. Mr. Dudley became increasingly concerned that the Center had failed an audit before he arrived and that the plaintiff had not assisted his previous supervisor in managing the inventory, despite plaintiff's 20 years of experience and his training of third-party contractors about defendant's inventory processes. When Mr. Dudley asked the plaintiff about the inventory failures, the plaintiff stated that he knew how to do the

3

inventory but believed it was not his responsibility.

Mr. Dudley subsequently prepared and delivered an "Addendum" to the plaintiff's 2003 Performance Appraisal which explained how plaintiff had failed to meet the four specific goals previously established for him, and criticized plaintiff's lack of presence in the warehouse. Mr. Dudley repeatedly told the plaintiff that he must be on the warehouse floor to manage inventory, and could not do the job properly from his office. On April 1, 2004, Mr. Dudley advised the plaintiff in writing that his failure to get out of the office and on the floor was unacceptable. Later, in January of 2005, Mr. Dudley advised the plaintiff in writing that he could not manage inventory from his office, directed him to get on the floor in 2005, and notified him that he was expected to be on the floor 75 to 85 percent of the time. Thereafter, Mr. Dudley continued to believe that the plaintiff failed to spend sufficient time on the floor. Plaintiff continued to believe that he made the ten aisle checks required per month to physically confirm the presence of tires shown on the inventory records, but understood that Mr. Dudley thought he should do them more often.

On April 29, 2005, Mr. Dudley delivered plaintiff's annual Performance Appraisal for 2004, rating the plaintiff as "unsatisfactory." Mr. Dudley believed the plaintiff failed to follow instructions, failed to complete the required aisle checks, failed to cooperate with other staff, had an "adversarial" relationship with him which bordered on insubordination, and failed to become involved in day-to-day operations on the floor, all of which contributed to the inventory issues. Plaintiff agrees that his working relationship with Mr. Dudley had problems, but he felt duty-bound to point matters out to Mr. Dudley which he considered to be unethical or inappropriate. Shortly after this performance

4

evaluation was issued, Mr. Dudley instructed the plaintiff that he no longer needed to attend staff meetings.

Mr. Dudley had other concerns about the plaintiff's job performance as well. When certain employees were directed to move their offices to the warehouse so they would be closer to the operation they managed, plaintiff resisted moving from the front office into the warehouse. After the plaintiff moved his office to the floor in early May of 2005, his telephone and computer did not work for approximately two months, although Mr. Prescott's and Mr. Barger's did.

On May 19, 2005, Mr. Dudley spoke with plaintiff and Chris Prescott about unresolved shipping errors which plaintiff had investigated, believing that to be part of his regular duty. Plaintiff was unaware that Mr. Dudley had reassigned the responsibility for this task to Mr. Prescott, who had performed the duties more timely. The next week, Mr. Dudley counseled plaintiff about audit problems but plaintiff blamed Prescott. Mr. Dudley challenged this excuse because plaintiff had been charged with training Mr. Prescott on those procedures. Also in May, Mr. Dudley reminded plaintiff that he was not permitted to park where he was parking. Plaintiff was the only associate who had failed to comply with a prior directive about parking.

In June of 2005, Mr. Dudley sent plaintiff an e-mail, stating he was "totally disappointed" that the FSOs and counts had not been done in a timely manner and that the inventory had not been reconciled, and asking whether he needed to reassign the function to get it handled weekly as instructed.

In August of 2004, Mr. Dudley had notified his manager in Akron that he was considering eliminating plaintiff's position because his job could be absorbed into other

5

existing jobs. No action was taken at that time. Mr. Dudley again proposed the elimination of the plaintiff's position in a fax sent the morning of June 3, 2005, "because of our top-heavy management situation." That same day, the plaintiff used defendant's internal reporting hotline to complain about Mr. Dudley's use of profanity in the workplace. Action on Mr. Dudley's proposal to eliminate plaintiff's position was postponed pending investigation of plaintiff's profanity complaint.

In July of 2005 when the plaintiff was on vacation, the two-piece tire inventory for which the plaintiff was responsible was found to be in disarray. Mr. Dudley worked with others to correct the inventory and developed new processes to manage that inventory. When plaintiff returned on August 2nd, Mr. Dudley advised him that he was being removed from managing the two-piece tire inventory process because of the problems and that Mr. Prescott, Mr. Barger, and Mr. Dudley would take over that responsibility. Plaintiff denied responsibility for the deficiencies and blamed Mr. Prescott, but because the plaintiff had trained and supervised Mr. Prescott on that inventory, Mr. Dudley did not perceive his excuses to be justified.

Plaintiff's complaint about Mr. Dudley's language was investigated by a Human Resources Representative. After that investigation, Mr. Dudley was counseled, his language improved, and plaintiff complained no more about it.

During that investigation, the plaintiff made a new complaint, supported by a log kept by the plaintiff, that Mr. Dudley and the Topeka Distribution Center were falsifying ISO-related documents. Plaintiff believed that the company was not having management review meetings or trend meetings, as required, but was reporting their occurrence anyway. This complaint was referred to defendant's Internal Audit

6

department for investigation. On or about July 15, 2005, Field Auditor DeGarmo, who had just finished an audit of the Topeka Distribution Center, was assigned to review plaintiff's ISO concerns. He had recently completed a report, dated July 6, 2005, which found that all areas he examined were "compliant with corporate guidelines and procedures," and which commended Mr. Dudley and his team for the manner in which the facility was being operated.

On July 18th, Mr. DeGarmo returned to Topeka to investigate the plaintiff's ISO concerns and conducted a review and investigation of the documents presented. He concluded in an Audit Report dated July 28, 2005, that "none of the allegations relating to the falsification of company records or degradation of the ISO system were found to be substantiated."

Plaintiff also challenged his 2004 Performance Appraisal by sending letters on June 7th to Mr. Dudley's manager, Mr. Hessler, and to Mr. Hessler's superior, Patrick Hurley, seeking a review of his "unsatisfactory" rating which the plaintiff asserted stemmed from "creative differences." In response, Mr. Hessler met with the plaintiff in Topeka on September 7, 2005, and upheld the "unsatisfactory" rating.

On September 6th, the day before plaintiff's scheduled meeting with Mr. Hessler, the plaintiff mailed letters to several internal and external parties alleging ISO falsification and fraud by Mr. Dudley. The plaintiff was aware that the Topeka Distribution Center was scheduled for an outside, independent ISO certification audit by Greg Lowe later that month. Mr. Hessler responded to plaintiff's letter by telling plaintiff that Mr. Lowe would closely review his claims and would spend some extra time for that purpose in Topeka during his upcoming audit.

Mr. Lowe audited the Topeka Distribution Center on September 14-15, 2005, and spent additional time to investigate evidence related to the plaintiff's allegations. In his final report, Mr. Lowe concluded that "the evidence reviewed did not substantiate falsification of reports or degradation of the Quality Management System." He observed that "the method of documenting process approach internal audits at the Topeka location [was] among the best of all Goodyear logistics centers," and recommended continued registration, finding no open non-conformances.

During the summer of 2005, managers of Goodyear's logistics and distribution operations considered a reduction in force to improve profitability, targeting a layoff date at the end of September. After Mr. Lowe's report was issued, removing the cloud plaintiff had cast over Mr. Dudley and the Topeka Distribution Center, management decided to go forward with Mr. Dudley's earlier proposal to eliminate the plaintiff's job and lay him off as part of the reduction in force. Accordingly, the plaintiff and fourteen other Supply Chain employees were laid off effective September 30, 2005. The plaintiff was the only African-American in the group laid off, which averaged 22 years of service at Goodyear. He was subsequently advised that he was not subject to recall due to his unsatisfactory performance review in 2004.

**Section 1981 terms and conditions**

Plaintiff first claims that the defendant discriminated against him on the basis of his race by subjecting him to adverse terms and conditions of employment. The pretrial order[2] alleges the following adverse acts of the defendant: 1) giving the plaintiff an

---

[2]Allegations in the plaintiff's briefs which are not included in the pretrial order are not actionable so shall not be discussed.

8

unwarranted "unsatisfactory" performance review of 2004; 2) subjecting the plaintiff to false allegations of conduct; 3) isolating and segregating the plaintiff; 4) barring the plaintiff's access to essential staff meetings; and 5) denying the plaintiff training on the same or similar terms as Caucasian employees.

A § 1981 plaintiff must prove by a preponderance of the evidence that the defendant intentionally discriminated against him on the basis of race. Defendant challenges plaintiff's prima facie case and showing of pretext regarding this claim. Because the record contains no direct evidence of race discrimination, the court applies the burden-shifting scheme of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006).

Plaintiff's burden to establish a prima facie case of discrimination based on disparate treatment is well established.

> A prima facie case of racial discrimination based upon disparate treatment requires a plaintiff to show: "(1) that he is a member of a [protected class], (2) that he suffered an adverse employment action, and (3) that similarly situated employees were treated differently." *Trujillo v. Univ. of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1215 (10th Cir.1998).

*Juarez v. Utah*, 263 Fed.Appx. 726, 737 (10th Cir. 2008). The elements remain the same whether the case is brought under §1981 or Title VII. *Carney v. City and County of* Denver, 534 F.3d 1269, 1273 (10th Cir. 2008).

It is uncontested that the plaintiff belongs to a protected class, meeting the first element of this claim. Defendant disputes the second element, contending that the plaintiff suffered no adverse employment action but his lay off.

In the context of a  § 1981 discrimination claim, an adverse employment action is

9

a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007) (quotation omitted). "An adverse employment action "must be materially adverse to the employee's job status." *Duncan v. Manager, Dep't of Safety, Denver*, 397 F.3d 1300, 1314 (10th Cir. 2005)." *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 979 (10th Cir. 2008). The test for determining whether an action would have been considered material by an employee is an objective one which asks how a reasonable employee would have interpreted or responded to the action. *Somoza v. University of Denver,* 513 F.3d 1206, 1213 (10th Cir. 2008) (analyzing retaliation claim in light of *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)), citing *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079 (10th Cir. 2007).  The court liberally interprets the phrase and takes a "case-by-case approach, examining the unique factors relevant to the situation at hand." *Piercy,* 480 F.3d at 1203.  At the same time, "a mere inconvenience or an alteration of job responsibilities" will not rise to the level of an adverse employment action. *Id.* (quotation omitted).

The court first examines whether the defendant's issuance of an "unsatisfactory" performance review to plaintiff of the year 2004 constitutes adverse action. Under Tenth Circuit law, a performance improvement plan is not an adverse employment action unless it effects a significant change in the plaintiff's employment status. *See Haynes v. Level 3 Communications, LLC,* 456 F.3d 1215, 1224 (10th Cir. 2006), *cert. denied*, 549 U.S. 1252 (2007). Here, the plaintiff has not shown that his performance review affected any change in his employment status. Accordingly, it has not been shown to be an

10

adverse action, despite the fact plaintiff was rated "unsatisfactory."

Alternatively, assuming that plaintiff has made a prima facie case of discrimination as to his 2004 evaluation, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for plaintiff's lay off. *Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir.1999), *cert. denied*, 529 U.S. 1110 (2000). That burden is neither onerous nor empty. *See Anaeme v. Diagnostek*, Inc.,164 F.3d 1275, 1279 (10th Cir.) (recognizing the employer's burden is "exceedingly light"), *cert. denied*, 528 U.S. 814 (1999). Defendant has met this burden by documenting that the reason for plaintiff's disciplinary actions and ultimate lay off was unsatisfactory job performance. Specifically, defendant asserts that the plaintiff persistently spent insufficient time on the warehouse floor, resisted relocating his office to the warehouse, was ineffective or inadequate in inventory cycle counts, and displayed an attitude which bordered on insubordination, all of which negatively affected defendant's inventory. Poor job performance is a "quintessentially legitimate and nondiscriminatory reason for termination." *Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114, 1125 (10th Cir. 2005). This is sufficient to meet the defendant's burden at this stage, and to cast upon the plaintiff the burden to show pretext.

Pretext may be shown by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence" and therefore infer that the employer's actions were not for the reasons given. *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006); *Plotke v. White*, 405 F.3d 1092, 1102 (10th Cir. 2005) (quotation omitted). The

11

plaintiff urges the applicability of this rule to the reasons given for his unsatisfactory 2004 evaluation.

This case differs from most other race discrimination cases this court has decided because the decisionmaker[3] in this case, Mr. Dudley, is the same race as the plaintiff. Defendant asserts that this fact "dissipates any suggestion that the evaluation was tinged with race discrimination." Dk. 26, p. 23. The court believes that the word "dissipate" overstates the matter, but agrees that where, as here, the decisionmaker is in the same protected class as the plaintiff, claims of discrimination become less plausible and inferences of discrimination are weakened.

The court recognizes that members of a protected class may sometimes discriminate against other members of that same class. *Oncale v. Sundower Offshore Services, Inc.*, 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). *See Saint Francis College v. Al-Khazraji* 481 U.S. 604, 605, 107 S.Ct. 2022, 2023 - 2024 (1987) (rejecting the contention that § 1981 does not encompass claims of discrimination by one Caucasian against another.) "Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group." *Castaneda v. Partida*, 430 U.S. 482, 499, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). *See United States v. Crosby*, 59 F.3d 1133, 1135, n. 4 (11th Cir.1995) (recognizing that "a Title VII violation may occur even where a supervisor or decision-maker is of the same race as the alleged

---

[3]Plaintiff does not dispute that Mr. Dudley was the decisionmaker. Although the record shows that other persons approved Mr. Dudley's recommendation to eliminate the plaintiff's position, only Mr. Dudley's acts are alleged to be discriminatory.

victim.")

Despite this principle, a plaintiff faces a difficult burden of establishing discrimination when the decision-maker is in the same protected class as the plaintif. *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991). *See Vasilescu v. Black & Veatch Pritchard, Inc.*, 155 F. Supp. 2d 1285, 1293 (D. Kan. 2001) (examining an age discrimination claim); *Kitchen v. Burlington Northern & Sante Fe R. Co.*, 298 F. Supp. 2d 1193, 1203 (D. Kan. 2004) (examining an age discrimination claim in which the decision-maker was a year and a half younger than the plaintiff).

Although the fact is not dispositive, proof that the decisionmaker is a the same race as the plaintiff considerably undermines the probability that race was a negative factor in the employment decision. *See Kidd v. Greyhound Lines, Inc.*, 2005 WL 3988832, 4 (E.D.Va. 2005) (finding "a strong inference that racial discrimination was not a determining factor for the adverse action" when the person who both hired and fired the African-American plaintiff is also an African-American"), *aff'd*, 135 Fed.Appx. 615 (4th Cir.), *cert. denied*, 546 U.S. 1006 (2005); *Taylor v. Procter & Gamble Dover Wipes*, 184 F.Supp.2d 402, 413 (D.Del. 2002) (finding inference of discrimination "less plausible" when the decision-maker is the same race as the plaintiff, making the likelihood that a supervisor's statement evidenced discrimination "remote."), *aff'd*, 53 Fed.Appx. 649 (3rd Cir. 2002); *Rajbahadoorsingh v. Chase Manhattan Bank, NA*, 168 F.Supp.2d 496 (D.V.I. 2001) (finding, where plaintiff and decision-maker were of same race, "it is hard to fathom how [decision-maker's] statements could be construed to show that [plaintiff's] termination was racially motivated"); *Kendrick v. Penske Transp. Servs., Inc.*, 1999 WL 450886 at *7 (D. Kan. Apr. 13, 1999) (race discrimination case

13

noting, "the plaintiff may have difficulty establishing discrimination where the alleged discriminatory decision-maker is in the same protected class as plaintiff") *aff'd*, 220 F.3d 1220 (10th Cir. 2000); *Anderson v. Anheuser-Busch, Inc*, 65 F.Supp2d 218, 229 (SDNY 1999) (finding fact that plaintiff and a decision-maker were both black "weakens the inference of discrimination"), *aff'd*, 229 F.3d 1135 (2d Cir. 2000); *Toliver v. Community Action Comm'n to Help the Economy, Inc.*, 613 F.Supp. 1070 (S.D.N.Y.1985), *aff'd* 800 F.2d 1128 (2d Cir.), *cert. denied*, 479 U.S. 863 (1986) (finding "implausible" any inference that African-American's termination was due to race discrimination where six of eleven persons on the decision-making board were African-American).   Having reviewed the record, the court is firmly convinced that the plaintiff has failed to raise a material question of fact regarding pretext. Nothing in the record raises an inference that race was a factor in the negative performance evaluation. "Even though all doubts concerning pretext must be resolved in plaintiff's favor, a plaintiff's allegations alone will not defeat summary judgment. Mere conjecture that the employer's explanation is pretext is insufficient basis to defeat summary judgment." *Jencks v. Modern Woodmen of America*, 479 F.3d 1261, 1267 (10th Cir.2007) (citation and quotations omitted).The Tenth Circuit has consistently held that "unsupported assertions by an employee that an employer's actions are based on his race are insufficient to avoid summary judgment. (Citation omitted)." *Domai v. Discover Financial Services, Inc.*, 244 Fed.Appx. 169, 174 (10th Cir. 2007). Here, it is just as likely that personal animosity or "creative differences" formed the basis for the plaintiff and Mr. Dudley's disagreements. "Personal animosity is not the equivalent of ... discrimination and is not proscribed by Title VII." *McCollum v. Bolger*, 794 F.2d 602, 609-10 (11th Cir.1986)), *cert. denied*, 479 U.S. 1034 (1987).

14

Summary judgment is thus appropriate on the plaintiff's claims of race discrimination based upon his 2004 performance review.

The pretrial order also alleges adverse conduct by defendant's subjecting the plainitff to "false allegations of conduct." The record fails to specify what false allegations of conduct were made. The plaintiff has not shown that the defendant made any false statements of fact about the plaintiff's conduct, but has merely shown the plaintiff's disagreement with the assessment of his performance by Mr. Dudley. This is insufficient, as it is not the court's role to second guess an employer's business judgment. *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004).

> "The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs." (Citation omitted.) "In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person making the decision." *Watts v. Norman*, 270 F.3d 1288, 1295 (10th Cir.2001) (internal quotation marks omitted).

*Rivera v. City and County of Denver*, 365 F.3d 912, 924 -925 (10th Cir. 2004).

Plaintiff additionally claims that he was isolated and segregated. This assertion is supported by the fact that the plaintiff's office was moved to the back of the warehouse on May 7 and 8, 2005, at Mr. Dudley's direction. However, the offices of Mr. Barger and Mr. Prescott, two white co-workers, were also moved to the same location. Plaintiff's office was not targeted for different treatment. Instead, moving the plaintiff's office was part of a larger reorganization of management staff offices after a downsizing of the warehouse operation. Dk. 39, Depo. Exh. 19. The stated goals of the office reorganization were to create a better flow of work between the office staff and the floor coordinators, and to enhance defendant's ability to change course as customer

requirements dictated. Even assuming that plaintiff could made a prima facie case of discrimination as to the moving of his office, the defendant has shown a legitimate, nondiscriminatory reason for so doing, which the plaintiff has not shown to be pretextual.

Plaintiff does show the court that he was without phone and computer service for approximately two months after his office was moved, although Mr. Barger and Mr. Prescott had such service. This hindered his ability to generate documents and provide information to Mr. Dudley for morning staff meetings for one week. Plaintiff admits, however, that he knew a digital switch was needed to get his equipment working, that the switch had to be ordered, and that it was provided pretty quickly after the plaintiff called and asked the person in charge about it. Dk. 39, plaintiff's depo. p.71-72. Plaintiff fails to show that any of Mr. Dudley's acts or inactions if any in causing or contributing to the delay in his getting this equipment was race based.

Plaintiff next contends that the defendant barred his access to essential staff meetings. The record confirms only that on May 18, 2005, Mr. Dudley sent the plaintiff an e-mail stating, "James, beginning today, you will no longer be required to attend the 8:30 daily meeting." Dk. 26, App.G. The plain language of this e-mail fails to support the plaintiff's assertion that he was barred from attending staff meetings, and shows instead that the plaintiff was given the choice not to attend them. Assuming, however, that the e-mail would convey to a reasonable employee in the plaintiff's position that his presence at staff meetings was no longer welcomed, the plaintiff has not shown what effect, if any, his absence at the morning meetings had upon his job. Plaintiff has not shown what kind of information was discussed during the morning meetings, whether

16

the morning meetings were the only staff meetings, the nature of the interaction at such meetings, or other facts which would show that this action caused a significant change in the plaintiff's employment status.

Even assuming, arguendo, that the e-mail constitutes adverse action, the defendant has articulated a legitimate nondiscriminatory reason for this act. Plaintiff does not dispute Mr. Dudley's belief that the plaintiff was often late, was ill-prepared to discuss inventory issues, and had little to contribute when asked about the inventory department even before the plaintiff's office move, and he thought it was more efficient for the plaintiff to be on the floor making sure employees were performing the inventory processes. The plaintiff admits that he was counseled about being late and being disrespectful of Mr. Dudley, and that there were a lot of things that Mr. Dudley was not happy with. The court finds that the plaintiff has failed to raise a material question of fact that these reasons are pretextual.

The pretrial order additionally contends that defendant denied the plaintiff training on the same or similar terms as Caucasian employees. In support of this allegation, the plaintiff alleges that Mr. Dudley refused to authorize payment of vouchers for a Goodyear approved training course the plaintiff attended on April 15th and 16th, 2004, that he was the only African-American on management staff, and that white co-workers would go on trip after trip and get their expenses reimbursed. Dk. 35, p. 6.

The plaintiff's assertion that Mr. Dudley refused to authorize payment for this training course is not supported by the record. Instead, the record shows that when the plaintiff proposed attending this course in Kansas City, Mr. Dudley responded by e-mailing, "James, If you take that class in Kansas, plan on driving back to Topeka each

17

day. Goodyear won't pay the overnight cost to stay." Dk. 39, Depo. Exh. 10. Plaintiff has

not shown that he was denied any expense except a hotel expense, has not shown that

any white employee was permitted a hotel expense for attendance at a similarly close

training course, nor has he shown any personal knowledge of what expenses were and

were not reimbursed for other employees.

The only other training claim briefed by the plaintiff is that he "was told by Mr.

Dorsey (sic) that he would be given the time and opportunity to work on weaknesses

noted in his evaluation through the Goodyear University and outside development

courses, but was never given the opportunity to do so." Dk. 35, p. 9. Plaintiff's testimony

reveals that Mr. Dorsey Hessler's statement was made to plaintiff at a meeting on July

28, 2005, and that the plaintiff was laid off effective October 1, 2005. No evidence

shows that any courses of assistance to the plaintiff were available during that two

month period or that any white person was permitted to participate in any course the

plaintiff desired to take during those two months or that the plaintiff's lack of participation

in any such course was based upon his race.

In short, the plaintiff has failed to make a prima facie case of disparate terms and

conditions of employment. Alternatively, the plaintiff has failed to show that the reasons

given by the defendant for its adverse acts are pretextual.

**Section 1981 lay off**

Plaintiff additionally claims that his lay off was race-based, in violation of §1981.

Defendant concedes that the plaintiff has shown a prima facie case of race

discrimination in his lay off from employment. *See Bittel v. Pfizer, Inc.,* 2009 WL 52064,

4 (10th Cir. 2009); *Juarez v. ACS Government Solutions Group, Inc.*, 314 F.3d 1243,

18

1245 -1246 (10th Cir. 2003); *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir.), *cert. denied*, 525 U.S. 1054 (1998).

As its legitimate, nondiscriminatory reason for the adverse action, defendant shows the court that the plaintiff's position was eliminated in a reduction in force (RIF) along with the positions of fourteen non- African-American employees, that the plaintiff's job performance was unsatisfactory, and that the plaintiff's job duties could be done more economically if they were spread among existing employees. This is sufficient to meet the defendant's burden at this stage and to cast upon the plaintiff the burden to show that those reasons are pretextual.

Pretext may be shown in various ways in race discrimination cases. In RIF cases, pretext is usually shown by attacking the RIF itself.

> In the typical RIF case, a plaintiff demonstrates pretext by presenting evidence that his or her termination did not accord with the company's RIF criteria, that the RIF criteria were deliberately falsified or manipulated to secure the plaintiff's dismissal, or that the RIF generally was pretextual. *Pippin*, 440 F.3d at 1193.

*Hinds v. Sprint/United Management Co.*, 523 F.3d 1187, 1197 (10th Cir. 2008). *See Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1181 (10th Cir. 2002); *Bittel*, 2009 WL 52064, 4.

The plaintiff does not allege that his lay off contravened the defendant's RIF criteria, that the RIF criteria were deliberately manipulated to secure his dismissal, or that the RIF was generally pretextual. In fact, the record does not disclose what the defendant's RIF criteria were. No evidence is shown that the plaintiff's position was targeted for elimination because of his race, that his position was reinstated soon after his departure, or that his position was retained and filled by someone of another race.

19

Instead, the plaintiff relies upon the cumulative effect of the evidence presented in support of his terms and conditions claim, which the court finds to be conclusory and speculative.

The court's role is "to prevent intentional discriminatory ... practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Orr v. City of Albuquerque*, 531 F.3d 1210, 1217 (10th Cir. 2008). Here, as above, the record fails to raise a material question of fact that the elimination of the plaintiff's position was in any way based upon plaintiff's race.

**Kansas common law claim**

The last claim included in the pretrial order is a "whistleblower" retaliatory discharge in violation of Kansas state law. *See* Dk. 17, p. 5-7. Plaintiff contends that his lay off was in retaliation for his opposition to Mr. Dudley's actions which plaintiff claimed were fraudulent or unlawful. Specifically, the plaintiff alleges that he engaged in protected activity by reporting defendant's "fraud" in its participation in the ISO program and by reporting a violation of Title VII, *i.e.*, Mr. Dudley's use of profanity in the workplace. Dk. 17, p. 6. He additionally claims that he suffered adverse employment action as a result of his opposition or reports, and that defendant's stated reasons for the adverse employment action are a pretext for retaliation. *Id.*

Under Kansas law, "an employer may discharge his "at-will employee" for good cause, for no cause, or even for a wrong cause, without incurring liability to the employee for wrongful discharge." *Morriss v. Coleman Co.*, Inc.  241 Kan. 501, 508, 738 P.2d 841, 846 (1987).The Kansas Supreme Court has recognized limited public policy exceptions to this at-will employment doctrine, including the whistle-blower's exception

20

relevant here, first announced in *Palmer v. Brown*, 242 Kan. 893, 900, 752 P.2d 685

(1988).

Plaintiff must prove the elements of this tort claim by clear and convincing

evidence.

> To maintain such action, an employee has the burden of proving by clear and convincing evidence, under the facts of the case, a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee; and the employee was discharged in retaliation for making the report. ...In addition, the reporting must have been done in good faith, and the infraction must have been reported to either company management or law enforcement officials.

242 Kan. at 900. To meet the burden of proof by clear and convincing evidence, the

plaintiff must establish that "the truth of the facts asserted is highly probable." *In re*

*B.D.-Y.*, 286 Kan. 686, 187 P.3d 594, 602 (2008) (disapproving other definitions in

earlier cases).

> The whistleblower exception only applies where the discharge "seriously contravenes public policy." *Aiken v. Bus. & Indus. Health Group, Inc.*, 886 F.Supp. 1565, 1573 (D.Kan.1995) (citing *Cain v. Kan. Corp. Comm'n*, 673 P.2d 451, 454 (Kan.1983)). Public policy cannot be determined on a subjective basis, but "should be so thoroughly established as a state of public mind so united and so definite and fixed that its existence is not subject to any substantial doubt." *Palmer v. Brown, M.D.*, 752 P.2d 685, 689 (1988).

*Wells v. Accredo Health Group, Inc.*, 2006 WL 1913140, 2 (D.Kan. 2006).

The Kansas courts' recognition of the whistleblower cause of action is thus "limited to

wrongful discharge in violation of state public policy clearly declared by the legislature or

by the courts." *Coleman v. Safeway Stores*, 242 Kan. 804, Syl. ¶ 4, 752 P.2d 645

(1988).

**ISO Procedures**

21

Defendant contends that retaliation against the plaintiff for reporting ISO failings is not actionable under the State's public policy exception. Under Kansas law, "It is declared the public policy of the State of Kansas to encourage citizens to report infractions of the law pertaining to public health, safety, and the general welfare." *Palmer*, 242 Kan. 893, Syl. ¶ 1, 752 P.2d 685. *See Flenker*, 266 Kan. at 204. Plaintiff contends that the corporation's fraudulent acts related to the ISO violate the law pertaining to the general welfare of the citizens of Kansas.

The record reveals little about the ISO Program, except that it is a quality system standard, designed to enhance the accuracy of shipping automotive related products to its customers. ISO standards are voluntary, but may become market requirements. Compliance with the ISO standards which the defendant allegedly violated are not related to safety, but to quality, of the product or service delivered. Plaintiff alleged that trend meetings, which would have discussed matters such as why a customer received the wrong tires, were not being held, but that the defendant fraudulently reported that they and other ISO- related meetings were held.

*Palmer* requires plaintiff to establish that a reasonable person would have concluded that defendant's activities violated rules pertaining to public health, safety and general welfare. *Palmer*, 242 Kan. at 900. Here, the record, viewed in the light most favorable to the plaintiff, shows that the plaintiff reported alleged violations of guidelines designed to assist the defendant's internal quality control or delivery of products to its customers. Plaintiff's complaint to Mr. Lowe, which he enclosed and sent to multiple persons, alleges the following:

many disturbing situations surround[ ] our quality program..., audits have not

22

been done, management and trend meeting reviews have not been held,
associate satisfaction surveys have not been conducted, many of our documents
have been falsified and few of our employees know that they have the right to
stop production in the event of a quality failure.

Dk. 26, Exh. 7. Other comments throughout that letter refer to the "quality program," or

the "quality system." Plaintiff's cover letter to Mr. Lawlor of the NSF International

Strategic Registration, which enclosed a copy of plaintiff's letter to Mr. Lowe, related

plaintiff's "concerns for our quality program as well as the need to review the results of

the NSF audit...the quality system of the warehouse floor needs to [be] thoroughly

tested also. *Id.* Nothing in the record shows that the alleged ISO failings posed any

danger to public health, safety, or general welfare, or constituted a  violation of rules,

regulations, or the law pertaining to such matters.

"Under Kansas law, whistleblower protection covers the reporting of matters

related to public health, safety or welfare, but does not extend to merely reporting

suspected failures to comply with internal company policies or procedures unrelated to

such laws. *Taylor v. Home Depot USA, Inc.*, 506 F.Supp.2d 504, 520 (D.Kan.2007)."

*Stoermann-Snelson v. St. Luke's Health System*, 2007 WL 4522492, 2 (D.Kan. 2007).

Thus even if this court assumed that the defendant's acts violated its own policies, there

is no clear mandate of Kansas public policy against terminating employees for the

whistleblowing activity engaged in by the plaintiff. Reports of internal violations of a

similar kind have been held to fall outside the protection of Kansas public policy. *See*

*Herman v. Western Financial Corp.*, 254 Kan. 870, 880, 869 P.2d 696, 704 (1994)

(report of mortgage loan irregularities); *Larson v. Ruskowitz*, 252 Kan. 963, 972, 850

P.2d 253, 260 (1993) (report of poor leadership and gross mismanagement of funds);

*Baker v. Wal-Mart Stores, Inc.*, No. 90-2231-O, 1991 WL 158895, at *3 (D.Kan. July 8,

1991) (summary judgment granted where plaintiff contended that he was fired for

reporting company policy violations committed by a co-worker). Compare *Fowler v.*

*Criticare Home Health Services, Inc.*, 27 Kan.App.2d 869, 875, 10 P.3d 8,14 (2000)

(report to common carrier that a co-employee had shipped handguns and live

ammunition through that common carrier without notifying it was a report of a violation

of a federal statute designed to protect public health and safety), aff'd 271 Kan. 715, 26

P.3d 69 (2001). "Absent a clear mandate of public policy as the foundation for plaintiff's

claims, plaintiff cannot establish a retaliatory discharge case. *See Goodman*, 78 P.3d at

823 (citing *Palmer*, 752 P.2d at 685)." *Wells*, 2006 WL 1913140, 3.

**Use of profanity**

The only other matter reported by the plaintiff and included in the pretrial order is

Mr. Dudley's use of profanity.  The pretrial order alleges that such language created

"gender based hostile work environment," and thus violated Kansas law pertaining to

public health, safety or general welfare, as necessary to support the tort of retaliatory

discharge. *See* Kansas Act Against Discrimination (KAAD), K.S.A. 44-1001 et seq.

The court disagrees. Although sexual harassment which creates a hostile work

environment violates Kansas law pertaining to public health, safety or general welfare,

the record fails to raise a material question of fact that Mr. Dudley's language created a

hostile work environment. The plaintiff has not supported his conclusion by reference to

any language used by Mr. Dudley. Although the plaintiff characterizes Mr. Dudley's

language as "profane," "vulgar," and "foul," and alleges that Mr. Dudley used such

language in his staff meetings whether females were present or not, the record fails to

24

reveal the specific words used by Mr. Dudley, the frequency with which he used them, the persons to whom they were directed, the context surrounding his speech, or how his speech was received by its hearers. The record is thus not sufficiently specific to permit a finding that Mr. Dudley used profanity, let alone that his language was sufficiently severe or pervasive as to arguably create a sexually hostile work environment actionable under Title VII. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 370 (1993); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406 (10th Cir.1987). Without making a record of the facts which allegedly created a hostile work environment, the plaintiff cannot raise a material question of fact that Mr. Dudley's language violated Kansas law pertaining to public health, safety or general welfare. Based upon the record, no reasonable person would conclude that the plaintiff's discharge was in retaliation for his reporting of a violation of state public policy clearly declared by the legislature or by the courts.

In light of this ruling, the court finds it unnecessary to address the defendant's remaining claims relating to alternative remedies, causation and good faith.

IT IS THEREFORE ORDERED that the defendant's motion for summary judgment (Dk. 25) is granted.

Dated this 20th day of May, 2009.

s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge